IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INO THERAPEUTICS LLC and | ) | |
| IKARIA, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-170 (GMS) |
| | ) | |
| PRAXAIR DISTRIBUTION, INC. and | ) | |
| PRAXAIR, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT
ON THE PLEADINGS FOR COUNTS I-V OF PLAINTIFFS' COMPLAINT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
dfahnestock@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Kenneth G. Schuler
David Callahan
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Melissa A. Brand
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

January 27, 2016

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS ................................................................................................ ii

I.      NATURE AND STAGE OF PROCEEDINGS ...................................................1

II.     SUMMARY OF ARGUMENT ..........................................................................1

III.    STATEMENT OF FACTS ..................................................................................2

        A.      The Five Challenged Patents ...................................................................2

        B.      Background of the Invention ....................................................................3

                1.      The Prior Use of iNO in Neonates Suffering From Hypoxic
                        Respiratory Failure Only Excluded Neonates Dependent on Right-
                        to-Left Shunting, Not Those With Preexisting LVD ...................................4

                2.      The Original INOT22 Study Protocol Did Not Exclude Neonates
                        with Non-RTL-Dependent LVD ..................................................................5

                3.      Unanticipated SAEs Occurred During the INOT22 Study, the
                        Study Was Amended, and the Rate of SAEs Was Significantly
                        Reduced.......................................................................................................6

        C.      Prosecution History.................................................................................7

IV.     LEGAL STANDARDS .......................................................................................8

        A.      Rule 12(c) Motions .................................................................................8

        B.      Section 101.............................................................................................9

V.      ARGUMENT.....................................................................................................11

        A.      Defendants' Motion Should Be Denied Because They Have Failed To
                Submit Evidence Required To Satisfy Their High  Burden ................................12

        B.      Defendants' Motion Should Be Denied Because The Parties Dispute That
                The Claims Recite a "Law Of Nature" .................................................................13

        C.      Defendants' Motion Should Be Denied Because The Parties Dispute
                Whether The Claims "As A Whole" Recite Only Conventional Activity............15

VI.     CONCLUSION...................................................................................................20

<u>TABLE OF AUTHORITIES</u>

Page(s)

## CASES

*Accenture Glob. Servs. Gmbh v. Guidewire Software, Inc.*,
   728 F.3d 1336 (Fed. Cir. 2013)..................................................................................8

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
   134 S. Ct. 2347 (2014)................................................................................1, 9, 19

*Ameritox, Ltd. v. Millennium Health, LLC*,
   88 F. Supp. 3d 885, 907 (W.D. Wisc. 2015)..........................................................16

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
   788 F.3d 1371 (Fed. Cir. 2015)..........................................................................13, 15

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
   133 S. Ct. 2107 (2013)............................................................................9, 10, 14, 18

*Ass'n For Molecular Pathology v. U.S. PTO*,
   689 F.3d 1303 (Fed. Cir. 2012)................................................................................10

*In re Cominsky*,
   554 F.3d 967 (Fed. Cir. 2009)....................................................................................8

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014)................................................................................19

*Diamond v. Chakrabarty*,
   447 U.S. 303 (1980)..................................................................................................14

*Diamond v. Diehr*,
   450 U.S. 175 (1981)............................................................................................10, 19

*Endo Pharm., Inc. v. Actavis Inc.*,
   Civil Action No. 14-1381-RGA, 2015 WL 5580488 (D. Del. Sept. 23, 2015),
   *adopted by* 2015 WL 7253674 (D. Del. Nov. 17, 2015) ...................................15, 19

*Internet Patents Corp. v. Active Network, Inc.*,
   790 F.3d 1343 (Fed. Cir. 2015)..........................................................................11, 17

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
   132 S. Ct. 1289 (2012).................................................................................... *passim*

*Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*,
   C.A. No. 1:13-cv-984-GMS, 2015 WL 436160 (D. Del. Jan. 27, 2015).........8, 9, 12

*Parks v. Booth*,
 102 U.S. 96 (1880) ...................................................................................................19

*Prometheus Labs., Inc. v. Roxane Labs., Inc.*,
 805 F.3d 1092 (Fed. Cir. 2015) .........................................................................11, 19

*Vanda Pharm. v. Roxane Labs., Inc.*,
 Nos. 1:13-cv-1973 & 1:14-cv-757, D.I. 148, at 1 (D. Del. Dec. 30, 2015) .......................8, 16

*Vanda Pharmaceuticals Inc. v. Roxane Laboratories, Inc.*,
 Nos. 13-1973 & 14-757, D.I. 126, at 60:5-61:9, 62:14-16, 63:7-8 (D. Del.
 Sept. 2, 2015) ...................................................................................................1, 12

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
 793 F.3d 1306 (Fed. Cir. 2015) ..............................................................................8

## STATUTES

35 U.S.C.
 § 100(b) ..............................................................................................................9
 § 101 ............................................................................................................ *passim*
 § 102 ...............................................................................................................11
 § 103 ..........................................................................................................11, 17

## I.      NATURE AND STAGE OF PROCEEDINGS

On February 19, 2015, Plaintiffs INO Therapeutics LLC and Ikaria, Inc. (collectively

"Plaintiffs") filed this suit alleging infringement of ten patents.[1]  On December 8, 2015,

Defendants Praxair Distribution, Inc. and Praxair, Inc. (collectively "Defendants") filed a motion

pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(c) for judgment on the pleadings alleging

that five asserted patents (a total of 147 claims) are ineligible under 35 U.S.C. § 101.  (D.I. 36.)

## II.     SUMMARY OF ARGUMENT

1.      Defendants have not even attempted to carry their heavy burden to show that the

claims of the challenged patents are invalid under § 101 by clear and convincing evidence at this

early stage of the litigation.  Under the Supreme Court's two-step framework laid out in *Mayo*

*Collaborative Services v. Prometheus Laboratories, Inc*., 132 S. Ct. 1289 (2012) and *Alice Corp.*

*Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014), Defendants must prove both that

(a) the claims are directed to a natural law and (b) the series of claimed steps, as a whole,

comprises conventional activity previously practiced in the field.  Defendants did not submit any

evidence in support of either proposition,  a failure of proof that alone requires that this Court

deny Defendants' motion for judgment on the pleadings, just as it did in *Vanda Pharmaceuticals*

*Inc. v. Roxane Laboratories, Inc.,* Nos. 13-1973 & 14-757, D.I. 126, at 60:5-61:9, 62:14-16,

63:7-8 (D. Del. Sept. 2, 2015) (attached as Ex. A).[2]

2.      At step one of the *Mayo/Alice* analysis, the parties dispute whether the claims are

directed to a "natural law" at all.  Defendants assert (without citing any evidence) that the

challenged claims are allegedly directed to the "natural law" that "administration of nitric oxide

---

[1]      On January 25, 2016, the parties filed a Joint Stipulation adding Plaintiff Mallinckrodt
Hospital Products IP Ltd. as a plaintiff.  (D.I. 50).

[2]      Exhibits A-V are attached to this opposition brief.  Exhibits 1-11 are attached to the
Declaration of Dr. Rosenthal (Ex. B).

to children with a condition known as left ventricular dysfunction ('LVD') can cause pulmonary edema."  (D.I. 36 at 1.)  But Plaintiffs point to unrebutted evidence showing that there is no such "natural law" in any relevant sense under controlling precedent.  At a minimum, that issue presents a factual dispute that precludes granting Defendants' premature motion.

　　　　3.　　　Regardless, at step two of the *Mayo*/*Alice* analysis, the parties also dispute whether, in addition to the purported natural law, the claims recite only a series of conventional steps that were routinely performed prior to the inventions described and claimed in the challenged patents.  Defendants make such an assertion, but all of the evidence—the patent specification, prosecution history, and extrinsic evidence (including the lone piece of evidence that Defendants did submit)—demonstrates that, far from being conventional, the combination of steps was contrary to the well-established scientific view at the time.  The claimed inventions are precisely of the type that *Mayo* itself and other cases have repeatedly made clear remain patent eligible:  modified uses of an existing drug.  But, at a minimum, that is yet another factual issue that precludes granting Defendants' premature motion.

## III.　STATEMENT OF FACTS

### A.　The Five Challenged Patents

　　　　Defendants' motion challenges five of the patents Plaintiffs assert in this action:  U.S. Patent Nos. 8,282,966 ("the '966 patent"), 8,293,284 ("the '284 patent"), 8,431,163 ("the '163 patent"), 8,795,741 ("the '741 patent"), and 8,846,112 ("the '112 patent") (collectively the "challenged patents").  The dates of issuance for the challenged patents range from October 9, 2012, to September 30, 2014—all of which were after the Supreme Court's March 2012 decision in *Mayo* and two of which were after the Supreme Court's June 2014 decision in *Alice*.

　　　　The challenged patents share a common specification and generally recite (or relate to) new methods for safely treating critically ill infants who are candidates for inhaled nitric oxide

2

("iNO") treatment while reducing the risk that the treatment will result in pulmonary edema and other serious adverse events ("SAEs").[3]  Specifically, the patents disclose a solution to the previously unknown problem that pediatric patients suffering from hypoxic respiratory failure who also suffer from left ventricular dysfunction ("LVD") have a greater risk of SAEs if they are administered iNO.  (*See*, *e.g.*, Ex. 1, '966 patent at 13:16-14:3.)[4]

The challenged patents have a total of 147 claims.  For example, claim 1 of the '966 patent provides:

> 1.  A method of reducing the risk of occurrence of pulmonary edema associated with a medical treatment comprising inhalation of 20 ppm nitric oxide gas, said method comprising::
>
> (a) performing echocardiography to identify a child in need of 20 ppm inhaled nitric oxide treatment for pulmonary hypertension, wherein the child is not dependent on right-to-left shunting of blood;
>
> (b) determining that the child identified in (a) has a pulmonary capillary wedge pressure greater than or equal to 20 mm Hg and thus has left ventricular dysfunction, so is at particular risk of pulmonary edema upon treatment with inhaled nitric oxide; and
>
> (c) excluding the child from inhaled nitric oxide treatment based on the determination that the child has left ventricular dysfunction and so is at particular risk of pulmonary edema upon treatment with inhaled nitric oxide.

**B.     Background of the Invention**

The inventions disclosed in the challenged patents arose from observations made during the INOT22 clinical study (Example 1 in the specification) which involved administering INOmax® (Plaintiffs' iNO product) to pediatric patients.  (Ex. 1, '966 patent at 9:20-14:3.) Designed by the leading experts in the field and consistent with the state of the art at the time, the INOT22 study did not exclude patients with pre-existing LVD.  (*Id.* at 9:20-64.)  Only after

---

[3]    The '112 patent recites methods of providing "pharmaceutically acceptable gas" to those who will safely treat critically ill infants who are candidates for iNO treatment along with information designed to reduce the risk that the treatment will result in pulmonary edema and other SAEs.

[4]    For convenience, citations are to the '966 patent specification unless otherwise noted.

significant numbers of SAEs occurred did it become clear that administering iNO to patients with LVD could be risky, leading to the claimed methods for safely providing iNO to pediatric patients, including term and near-term infants (known as "neonates").  (*Id*. at 9:20-14:3.)

### 1. The Prior Use of iNO in Neonates Suffering From Hypoxic Respiratory Failure Only Excluded Neonates Dependent on Right-to-Left Shunting, Not Those With Preexisting LVD

Plaintiffs' INOmax® product is FDA-approved for administration by inhalation to neonates suffering from hypoxic respiratory failure (abnormally low levels of oxygen in the bloodstream) associated with clinical or echocardiographic evidence of pulmonary hypertension (high pressure in the blood vessels going to the lungs), known as persistent pulmonary hypertension of the newborn ("PPHN").  (Ex. B, Rosenthal Decl. at ¶ 6; Ex. 8, Current INOmax® Label.)  In such neonates, the pulmonary vessels fail to adequately relax, and there is insufficient gas exchange.  (Ex. B, Rosenthal Decl. at ¶ 6.)  iNO relaxes the small vessels that are in close proximity to the aerated parts of the lung, increasing blood flow to the lungs.  (*Id*.)

However, administering iNO has significant risks.  (*Id*. ¶ 7.)  Some neonates have a severe congenital heart disease that prevents the left side of the heart from pumping blood to the rest of the body.  (*Id*.)  For these neonates, pulmonary vasoconstriction (normally problematic as discussed above) is actually *beneficial* (indeed, life-saving) because it creates a right-to-left shunt that allows the right ventricle to take on the role of the nonfunctioning left ventricle by pumping adequately oxygenated blood directly to the systemic circulation.  (*Id*.)  These neonates are described as being *dependent* upon right-to-left shunting of blood ("RTL-Dependent").  Administering iNO to such a neonate (lowering pulmonary vascular resistance) reduces blood flow to the body and coronary arteries and puts the infant at high risk of, among other things, severe acidosis, cardiogenic shock, and sudden death.  (*Id*.)  For these reasons, when the FDA

4

first approved INOmax® as safe and effective, it was contraindicated for RTL-Dependent

neonates.  (*Id*.; Ex. 2, 2000 INOmax® Label.)

INOmax® was not contraindicated for any other class of neonates including those *with*

LVD, but who were *not* RTL-Dependent ("non-RTL-Dependent").  This was consistent with the

prior clinical studies submitted in support of the original FDA approval of INOmax® that

administered iNO to pediatric patients, including neonates, which did not exclude non-RTL-

Dependent neonates suffering from LVD.  (Ex. B, Rosenthal Decl. at ¶ 8; Ex. 3; Ex. 4.)

### 2.      The Original INOT22 Study Protocol Did Not Exclude Neonates with Non-RTL-Dependent LVD

Beginning in 2004, Plaintiff INO Therapeutics LLC ("INOT") sponsored a clinical trial

(the "INOT22 Study") that compared the use and side effects of oxygen, iNO, and a combination

of oxygen and iNO for determining pulmonary reactivity.  (Ex. 1, '966 patent at 9:65-67.)  The

INOT22 Protocol did not exclude pediatric patients with other types of pre-existing LVD.  (*Id*. at

9:43-55; Ex. B, Rosenthal Decl. at ¶ 9; Ex. 5 at ¶¶ 9, 11; Ex. 6 at ¶ 7.)  The INOT22 study was

designed by INOT and a committee of "internationally recognized experts" in pediatric heart and

lung disease ("the INOT22 Steering Committee").  (Ex. B, Rosenthal Decl. at ¶ 9; Ex. 5 at ¶¶ 7-

8; Ex. 6 at ¶ 8.)  Before the study began, the INOT22 protocol was carefully reviewed by more

than 115 individuals "experienced in and responsible for the review of clinical trial protocols for

patient safety"—including institutional review boards, independent ethics committees, the

U.S. Food & Drug Administration ("FDA"), and equivalent agencies in other countries.  (Ex, B,

Rosenthal Decl. at ¶ 9; Ex. 6 at ¶ 11.)  *Not one* suggested that iNO might increase the likelihood

of adverse events in pediatric patients with non-RTL-Dependent LVD.  (*Id*.)

### 3.      Unanticipated SAEs Occurred During the INOT22 Study, the Study Was Amended, and the Rate of SAEs Was Significantly Reduced

Despite the review by these renowned experts in the field, five SAEs were observed in the first 24 subjects enrolled in the INOT22 study, a rate much higher than the INOT22 Steering Committee and INOT expected.  (Ex. 1, '966 patent at 12:30-13:5; Ex. B, Rosenthal Decl. at ¶ 10; Ex. 5 at ¶ 12.)  The SAEs were cardiovascular events, including pulmonary edema (accumulation of fluid in the lungs), cardiac arrest and hypotension (low blood pressure); one child who developed pulmonary edema died.  (Ex. 1, '966 patent at 12:30-13:5)  Some of the "patients suffering [SAEs] had severe [LVD] . . . and exhibited during their right-sided cardiac catheterizations an increased pulmonary capillary wedge pressure ('PCWP') of greater than 20 mm Hg, indicative of elevated pressures in the upper chamber of the left side of the heart (the left atrium)."  (Ex. C at ¶ 21.)  From these results, the inventors determined that "pediatric patients with left ventricular dysfunction" could be at "an increased risk of adverse events when inhaled NO was administered."  (Ex. D at ¶ 11; Ex. B, Rosenthal Decl. ¶ 11.)

After these unexpected SAEs, the INOT22 study protocol was amended to exclude patients with pre-existing non-RTL-Dependent LVD, *i.e.*, those having a PCWP greater than 20 mm Hg.  (Ex. 1, '966 patent at 12:24-38; Ex. B, Rosenthal Decl. at ¶ 12; Ex. 5 at 13.)  Thereafter, "the rate of [SAEs] (including [SAEs] associated with heart failure) was significantly reduced."  (Ex. 5 at ¶ 14; Ex. B, Rosenthal Decl. at ¶ 12.)  While five SAEs were reported in the first 24 patients of the study, only two SAEs were reported in the 100 patients after the protocol was amended.  (Ex. 5 at ¶ 14; Ex. B, Rosenthal Decl. at ¶ 12.)  On August 28, 2009, at INOT's request, the FDA approved a change to the INOmax® label to provide a warning that the use of iNO in patients with pre-existing LVD could cause SAEs, such as pulmonary edema.  (Ex. 5 at ¶¶ 15-16; Ex. 2, 2000 Label; Ex. 8, Current Label; Ex. B, Rosenthal Decl. at ¶ 15.)

Dr. David Wessel, chair of the INOT22 Steering Committee, stated that "[a]t the time of the design of the INOT22 Study protocol, neither [he], the other Steering Committee members, nor the study Sponsor appreciated or anticipated that a child with left ventricular dysfunction who is not dependent on right-to-left shunting of blood would be at additional risk when treated with [iNO].  This is the reason such children were not originally excluded from the INOT22 Study entry criteria." (Ex. 7 at ¶ 6.)  Had the adverse events been obvious, Dr. Wessel would have had to have "act[ed] either negligently or intentionally to harm babies, and [he] most certainly [did] not." (*Id.* at ¶ 8.)  The same applies to the "at least 115 individuals experienced in and responsible for the review of clinical trial protocols for patient safety," as well as the FDA and European Health Authorities that reviewed the original INOT22 protocol.  (Ex. 6, ¶ 11.)  None raised a concern about increased risk of using iNO in children with LVD who were non-RTL-Dependent.  (*Id.*; Ex. B, Rosenthal Decl. at ¶ 9.)  As inventor Dr. Baldassarre stated, prior to the INOT22 Study, it defied "common sense to any expert in this field" to not utilize iNO with this patient population.  (Ex. 5 at ¶ 11.)

### C.    Prosecution History

On June 30, 2009, based on the surprising results of the INOT22 study showing that safe use of iNO could warrant excluding neonates with non-RTL-Dependent LVD, INOT filed U.S. Patent Application No. 12/494,598, which ultimately issued as the five challenged patents.

Throughout the prosecution history, and in particular after the Supreme Court's decision in *Mayo*, the examiner thoroughly considered the patent-eligibility of the claims under § 101, in consultation with the U.S. Patent and Trademark Office's ("PTO") § 101 specialists and supervisors.  (*See*, *e.g.*, Ex. E at INO_19251, Ex. F. at INO_19441, Ex. G at INO_20242 ('112 patent file history excerpts).)  Post-*Mayo*, with further input and direction from the PTO, the applicant amended certain claims specifically to avoid any possible § 101 problems and to

overcome §101 rejections.  (*See* Ex. H at INO_11813, Ex. I at INO_11829 ('966 patent file

history excerpts); Ex. J at INO_15323 ('284 patent file history excerpt); Ex. K at INO_19816,

Ex. L at INO_20196 ('112 patent file history excerpts).)

## IV.   LEGAL STANDARDS

### A.   Rule 12(c) Motions

On a motion for judgment on the pleadings, "the court 'accept[s] all factual allegations as

true, construe[s] the complaint in the light most favorable to the plaintiff, and determine[s]

whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"

*Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, C.A. No. 1:13-cv-984-GMS, 2015 WL

436160, at *1 (D. Del. Jan. 27, 2015) (citation omitted).

Patent-eligibility under § 101 "is a question of law based on underlying facts," as this

Court recently recognized.  Ex. U, *Vanda Pharm. v. Roxane Labs., Inc.*, Nos. 1:13-cv-1973 &

1:14-cv-757, D.I. 148, at 1 n.1 (D. Del. Dec. 30, 2015) (material issues of fact precluded finding

certain medical treatment method claims ineligible under §101) (citing *In re Cominsky*, 554 F.3d

967, 975 (Fed. Cir. 2009)); *see also Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306,

1334, 1336 (Fed. Cir. 2015) (upholding trial forum's "underlying fact findings and credibility

determinations" regarding what constitutes conventional activity for § 101 analysis); *Accenture*

*Glob. Servs. Gmbh v. Guidewire Software, Inc.,* 728 F.3d 1336, 1341 (Fed. Cir. 2013) (§ 101

eligibility is legal issue that "may contain underlying factual issues") (citation omitted).  And this

Court has explained that a patent claim will not be found directed towards patent-ineligible

subject matter at the pleading stage unless, under "'the *only* plausible reading of the patent[,] …

there is clear and convincing evidence of ineligibility.'"  *Money Suite Co.*, 2015 WL 436160, at

*2 (citation omitted).

### B.      Section 101

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  Such patent-eligible subject matter "includes a new use of a known process, machine, manufacture, composition of matter, or material."  35 U.S.C. § 100(b).

These broad classifications are limited by three exceptions.  "Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice*, 134 S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc*., 133 S. Ct. 2107, 2116 (2013)).  But the Supreme Court has eschewed bright line rules in applying these exceptions, cautioning that courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law" because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'"  *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1293.)); *see also*, *e.g*., *Money Suite Co*., 2015 WL 436160, at *2 (quoting same).

In *Mayo* and *Alice*, the Supreme Court provided a two-part framework for determining patent eligibility under § 101.  *Mayo*, 132 S. Ct. at 1294, 1296-98; *Alice*, 134 S. Ct. at 2355, 2360.  First, this Court "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts."  *Alice*, 134 S. Ct. at 2355 (citation omitted).  Second, if so, the Court determines whether the claims are nonetheless eligible because they include something more—often called an "inventive concept."  *Id.*  In assessing whether the claims are inventive, the Court "consider[s] the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application."  *Id.* (internal quotations and citation omitted). Claims are eligible if, "as a whole," they recite more than "well-understood, routine, conventional activity previously engaged in by

9

scientists who work in the field." *Mayo*, 132 S. Ct. at 1298.  Such claims do not "risk

disproportionately tying up the use of the underlying ideas . . . and therefore remain eligible for

the monopoly granted under our patent laws." *Alice*, 134 S. Ct. at 2354-55 (citation omitted).

Notably, in *Mayo*, the Supreme Court emphasized two points critical to this motion.

First, the Court noted that:

> here, as we have said, the steps add nothing of significance to the natural
> laws themselves.  Unlike, say, a typical patent on a new drug *or a new way
> of using an existing drug*, the patent claims do not confine their reach to
> particular applications of those laws.

132 S. Ct. at 1302 (emphasis added).  Thus, the Supreme Court reiterated that "a typical patent

on … a new way of using an existing drug" *is* patent-eligible because even if it implicates a

natural law, its "reach" is "confined" to "particular applications" of such a law.  *Id.*  Second, the

Court also distinguished and reaffirmed its holding in *Diamond v. Diehr*, 450 U.S. 175, 185

(1981), where the Court found that claims on an improved method of curing rubber using a

known equation were patent eligible because "the *combination* of . . . steps" were not "in context

obvious, already in use, or purely conventional."  *Mayo*, 132 S. Ct. at 1299 (emphasis added).

Similarly, in *Myriad*, the Supreme Court emphasized that "'the first party with

knowledge of [a law of nature] is in an excellent position to claim applications of that

knowledge'" in the form of medical methods.  133 S. Ct. at 2120 (quoting *Ass'n For Molecular

Pathology v. U.S. PTO("Myriad")*, 689 F.3d 1303, 1349 (Fed. Cir. 2012) (Bryson, J., concurring

and dissenting)).  The Court pointed to one such patent-eligible method for detecting a certain

alteration in a certain gene.  *See id*. (agreeing with *Myriad*, 689 F.3d at 1349 (Bryson, J.) (citing

U.S. Patent No. 5,743,441, claim 21)).  Also in *Myriad*, the Federal Circuit found eligible a

method of screening potential cancer therapeutics by growing host cells in the presence of and in

the absence of a compound and comparing the growth rate, "wherein a slower rate of growth . . .

in the presence of said compound is indicative of a cancer therapeutic." 689 F.3d at 1310, 1335-37. The court held that the claim "does not simply apply a law of nature" but instead "applies certain steps to transformed cells that . . . are a product of man, not of nature." *Id.* at 1336. The Supreme Court declined to review that holding.

Further, the Supreme Court and Federal Circuit have recognized that the § 101 inquiry and the prior art inquiries of §§ 102 (novelty) and 103 (non-obviousness) "might sometimes overlap," *Mayo,* 132 S. Ct. at 1304, and that "pragmatic analysis of §101 is facilitated by considerations analogous to those of §§ 102 and 103 as applied to the particular case," *Internet Patents Corp. v. Active Network, Inc*., 790 F.3d 1343, 1347 (Fed. Cir. 2015). In that vein, in a § 103 case, the Federal Circuit recently acknowledged that identifying a group of patients who should not receive conventional treatment can qualify as a new way of using an existing drug:

> [I]n the field of personalized medicine, … a particular treatment may be effective with respect to one subset of patients *and ineffective (and even harmful) to another subset of patients*. Singling out a *particular subset of patients* for treatment (for example, patients with a particular gene) *may reflect a new and useful invention that is patent eligible* despite the existence of prior art or a prior art patent disclosing the treatment method to patients generally.

*Prometheus Labs., Inc. v. Roxane Labs., Inc*., 805 F.3d 1092, 1098 (Fed. Cir. 2015) (citation omitted; emphasis added).

## V.   ARGUMENT

Defendants' motion for judgment on the pleadings of invalidity under § 101 should be denied because:  (a) Defendants have a high burden to show invalidity of the challenged patents by clear and convincing evidence and have not even attempted to meet that burden by submitting evidence on any of the disputed factual issues, (b) the claims are not directed to an inviolable natural law (or there is at least a factual dispute on that score), and (c) even if they were directed

to such a natural law, the claims do not merely recite conventional activity (or that, too, raises a factual dispute).

### A.   Defendants' Motion Should Be Denied Because They Have Failed To Submit Evidence Required To Satisfy Their High  Burden

This Court should deny Defendants' motion because they have not come close to meeting their high burden to show that all 147 issued claims of the five challenged patents are invalid. To succeed on their motion for judgment on the pleadings, Defendants must demonstrate by clear and convincing evidence that the claims do nothing more than embody a law of nature and add routine and conventional steps—and Defendants must make a showing so indisputable that no reasonable trier of fact could conclude otherwise.  *See*, *e.g.*, *Money Suite Co.*, 2015 WL 436160, at *1-2.

In the face of this substantial burden, Defendants failed to submit any evidence to show either:  (1) the issued claims are directed to a law of nature or (2) the issued claims, as a whole, recite only conventional activity.  Defendants simply *assert* that both are true.  (D.I. 36 at 8). But that *ipse dixit* attorney argument is not evidence—and does not warrant disposing of this case at this stage, on the pleadings.  This Court should deny Defendants' motion for this reason alone.[5]

This Court recently confronted the same issue in *Vanda Pharmaceuticals Inc. v. Roxane Laboratories, Inc.,* Nos. 13-1973 & 14-757.  In that case, the defendant moved to dismiss the

---

[5]      At one point, for example, Defendants point to a passage from the '966 patent specification (D.I. 36 at 8), but that passage hardly constitutes clear and convincing evidence that the claims recite nothing more than a law of nature.  Instead, the passage notes that "[d]uring, and upon final analysis of the INOT22 study results, applicants discovered that rapidly decreasing the pulmonary vascular resistance, via the administration of iNO to a patient in need of such treatment, *may* be detrimental to patients with concomitant, pre-existing LVD" and that "a precaution for patients with LVD was proposed to be included in amended prescribing information for lNOmax®."  (Ex. 1, '966 Patent at 9:31-40.)

suit, arguing that the asserted medical treatment method claims were invalid under § 101.  This

Court denied the motion to dismiss and declined to resolve the § 101 issue at the pleading stage

without an evidentiary record.  (Ex. U, *Vanda Pharm.*, D.I. 126, at 60:5-61:9, 62:14-16, 63:7-8

(D. Del. Sept. 2, 2015).)  This Court should do likewise here.[6]

### B.    Defendants' Motion Should Be Denied Because The Parties Dispute That The Claims Recite a "Law Of Nature"

At step one of the *Mayo*/*Alice* analysis, Defendants argue that there is allegedly an

inviolable "law of nature" that "administration of nitric oxide to children with a condition known

as left ventricular dysfunction ('LVD') can cause pulmonary edema."  (D.I. 36 at 1.)  That

argument fails for two independent reasons.

First, it is at best a disputed fact issue whether the subject claims are directed to a natural

law.  Plaintiffs have submitted evidence that the discovery underlying the asserted patent claims

are not predicated on a natural law.  (Ex. B, Rosenthal Decl. ¶¶ 16-26.)  For example,

Dr. Rosenthal testifies that: (i) the interactions between the drug (iNO) and a child's circulatory

and respiratory systems are complex and not fully understood, (ii) even if, in the aggregate, the

patient population (or even the child patient population) as a whole exhibits a higher rate of

adverse events, that does not mean that *each and every* child with LVD is *necessarily* at

increased risk of a set of adverse events (let alone any particular adverse event, such as

pulmonary edema) when treated with nitric oxide, and (iii) in some circumstances, nitric oxide

could itself be effective and appropriate for treating a child's LVD.  (*Id.*)

Defendants submit no evidence to the contrary and instead cite only the patents

themselves.  (D.I. 36 at 8 (citing '966 patent at 9:22-40).)  The patents, however, do not support

_____

[6]    The two cases upon which Praxair most heavily relies, *Mayo* and *Ariosa*, were decided on summary judgment, after factual development, not on the pleadings.  *See Mayo*, 132 S. Ct. at 1296; *Ariosa Diagnostics, Inc. v. Sequenom, Inc*., 788 F.3d 1371, 1375 (Fed. Cir. 2015).

Defendants' assertion of a "natural law." To the contrary, the shared specification states that administering iNO "*may* be detrimental to patients with . . . LVD" (Ex. 1, '966 patent at 9:34-35) (emphasis added) and that "patients who had pre-existing LVD *may* experience an increased rate of [adverse events, such as pulmonary edema]" (*id.* at 13:62-63) (emphasis added), but (because a "law of nature" is *not* at issue here) they also note that "[t]he benefit/risk of using iNO in patients with clinically significant LVD should be evaluated on a case by case basis" (*id.* at 13:66-14:1). (*See also* Ex. M, '966 file history excerpt at INO_8910 (claims provide for "mandatory exclusion . . . even though the [iNO] treatment would be potentially beneficial to the patient").) Defendants' motion fails at this stage because Defendants have not remotely carried their burden to show that the asserted claims are predicated on an inviolate law of nature and because the available evidence thus far shows that they do not. At a minimum, this presents a disputed fact issue not suitable for resolution at the pleading stage.

Second, Defendants' assertion conflicts with established law. Thus, if Defendants' purported principle is a patent-ineligible "natural law," then *any* use of an existing drug in a certain way to obtain a desired outcome is likewise a patent-ineligible "natural law" and no patent can issue on a new method for using a drug. But the Supreme Court expressly rejected that sweeping position in *Mayo*, cautioning that at some level "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature" but that "a typical patent on . . . a new way of using an existing drug" remains patent-eligible. 132 S. Ct. at 1293, 1302. The Supreme Court also rejected a similar argument in *Myriad* in finding patent eligible claims on human-modified DNA. 133 S. Ct. at 2119. The party challenging eligibility argued that "'[t]he nucleotide sequence of cDNA is dictated by nature, not by the lab technician,'" but the Court determined that, while "[t]hat may be so," it does not make it a "product of nature" for purposes of the § 101 analysis.

14

*Id.* Indeed, Defendants' expansive approach to "natural" phenomena would render ineligible any man-made compositions that achieve useful results through "natural" processes, contrary to decades of case law. *See*, *e.g.*, *Diamond v. Chakrabarty*, 447 U.S. 303, 305, 309-10 (1980) (finding patent eligible claims on human-modified bacterium that could "break[] down multiple components of crude oil").[7]

Defendants' have failed to demonstrate that the challenged claims are directed to a law of nature at step one of the *Mayo/Alice* analysis—at most, Defendants has raised a disputed fact issue. Their pleading-stage motion should, therefore, be denied.

### C.   Defendants' Motion Should Be Denied Because The Parties Dispute Whether The Claims "As A Whole" Recite Only Conventional Activity

Even if Plaintiffs' challenged patent claims were directed to a natural law, they would nonetheless be eligible at step two of the *Mayo/Alice* analysis because, as a whole, the claims describe an application of that purported law—they do not just recite a conventional series of steps previously engaged in by scientists who work in the field. *See Mayo*, 132 S. Ct. at 1298.

For example, claim 1 of the '966 patent recites (1) identifying a child in need of iNO treatment (one who is not RTL-dependent), (2) determining that the child has LVD, and (3) excluding that child from iNO treatment to lessen the risk of pulmonary edema. (*Supra* at § III.A.)  Other claims provide for assessing patients with ongoing iNO treatment and discontinuing such treatment, as necessary, to avoid the risk of pulmonary edema or other serious adverse events.  (*See*, *e.g.*, Ex. V, '741 patent cl. 9, 17.)  Defendants argue that such claim

---

[7]   Praxair's reliance on *Ariosa* and *Endo* is unavailing as it was essentially undisputed that the claims in those cases were directed to natural laws or natural phenomena.  *See Ariosa*, 788 F.3d at 1376 (explaining that it was "undisputed" that the DNA being detected in maternal blood was naturally occurring and the finding claims were "directed to detecting the presence of" that "naturally occurring thing"); *Endo Pharm., Inc. v. Actavis Inc.*, Civil Action No. 14-1381-RGA, 2015 WL 5580488, at *6 (D. Del. Sept. 23, 2015) (patentee "effectively concede[d] the first step of the *Mayo* analysis"), *adopted by* 2015 WL 7253674 (D. Del. Nov. 17, 2015).

elements in "combination" were conventional—*i.e.*, that it was well-understood and routine that children with LVD, but who are not RTL-dependent, should be excluded from treatment with iNO.  (*E.g.*, D.I. 36 at 6, 9-12, 18.)  But Defendants submit no evidence that each claim, as a whole, constitutes conventional activity in the field and the only evidence submitted thus far shows the opposite:  although the individual analytical techniques were well-known and practiced, the process described in the claims was unconventional and not appreciated in the art.

First, the specification explains that, prior to the patent, non-RTL-dependent children with LVD were not excluded from iNO treatment.  (*Supra* at § III.B.1.)  As discussed, the INOT22 study itself did not exclude such children, even though it was designed and reviewed by more than 115 medical professionals in the public and private sectors.  (*Id.*)  And *none* of those professionals suggested that iNO might increase the likelihood of adverse events in pediatric patients with non-RTL-Dependent LVD.  (*Id.*)   It is plain, therefore, from the face of the patent that such exclusions were far from "conventional" and "routine," as Defendants must show for their motion to succeed.  *See Mayo*, 132 S. Ct. at 1298; *see also*, *e.g.*, *Ameritox, Ltd. v. Millennium Health, LLC*, 88 F. Supp. 3d 885, 907 (W.D. Wisc. 2015) ("if inventors engage in activities that run *counter* to scientific thought, those activities can hardly be considered conventional under § 101," such as "when a patent involves a combination of elements that the scientific community would not have thought to use").

Second, the patent file histories support that conclusion.  In prosecuting the patents, the examiners thoroughly vetted the claims under § 101, consulted with the PTO's in-house experts on § 101, and applied the holding in *Mayo* in finding the claims patent eligible.  (*See supra* at § III.C.)  Indeed, for one of the challenged patents, the claims were twice rejected in the wake of *Mayo* but, after extensive discussion between the applicant and the PTO (including the office's

§ 101 specialists), the applicant amended the claims and overcome the rejection.  (*See id.*; Ex. N at INO_19193, Ex. O at INO_19429, Ex. P at INO_19469, Ex. Q at INO_19440-42, ('112 file history excerpts).)[8]  The examiners also found, after much back and forth, that the claims were not obvious in light of prior art.  (*See, e.g.*, Ex. R at INO_12144-46, Ex. S at INO_12154 ('966 file history excerpts).)  The PTO's thorough consideration of the facts makes clear that there is nothing "conventional" about the claimed series of steps.

Third, more recently, the PTO's Patent Trial and Appeal Board ("PTAB") rejected Defendants' requests to institute *inter partes* review proceedings as to four of the challenged patents (the '966, '284, '163, and '741 patents).  (Ex. T, July 29, 2015 Non-Institution Decision.) The PTAB held that Defendants failed to show that the claims of those patents were likely obvious in light of prior art.  Of particular relevance here, the PTAB rejected Defendants' contention that it was well-understood in the art that "certain patients who have [LVD] would be at risk of pulmonary oedema, even if not dependent on right-to-left shunting of blood, and should not be treated with [iNO]."  (*Id.* at 15.)[9]

Fourth, consistent with that overwhelming intrinsic evidence, Plaintiffs' expert, Dr. Rosenthal, testifies that it was unknown in the field that it might be necessary to exclude from treatment children that are not RTL-dependent but have LVD.  (Ex. B, Rosenthal Decl. ¶¶ 9-14.)  As Dr. Rosenthal explains, "[p]rior to the INOT22 study with the amended protocol, there was no convincing scientific evidence that demonstrated an association between use of

---

[8]   *See also* Ex. U, *Vanda Pharm. v. Roxane Labs., Inc.*, Nos. 1:13-cv-1973 & 1:14-cv-757, D.I. 148, at 1 n.1 (noting that "the PTO explicitly considered the . . . patent in light of *Mayo* and upheld the patentability" and denying summary judgment of invalidity under § 101).

[9]   Praxair asserts that the PTAB's findings are irrelevant because they related to § 103 not § 101. (D.I. 36 at 1 n.1, 12 n.4.)  Although those sections provide separate requirements, the analyses "sometimes overlap."  *Mayo*, 132 S. Ct. at 1304; *see Internet Patents*, 790 F.3d at 1347 (§ 101 inquiry can be "facilitated by considerations analogous to those of . . . [§] 103"); *supra* at § IV.B.

nitric oxide in young infants with LVD and serious adverse events, such as pulmonary edema."
(*Id.* ¶ 13.)

Similarly, the only piece of evidence that Defendants submit—the initial FDA-approved label for INOT's iNO product (Ex. 2, 2000 INOmax® Label)—further confirms that the claims were *not* merely conventional practices.  Although the label stated that iNO was contraindicated for those with RTL-dependency, it tellingly did *not* warn against using iNO for those who were *not* RTL-dependent but had LVD.  (*See id.*)  Only *after* the INOT22 study surprised the medical community did INOT (with FDA approval) amend the label to indicate the potential risk for that particular subset of the patient population.  (Ex. 8, Current INOmax® Label.)  Therefore, the available extrinsic evidence, consistent with the patent specification and file history, shows that claimed steps absolutely do not recite "well-understood, routine, conventional activity previously engaged in by scientists who work in the field."  *Mayo*, 132 S. Ct. at 1298.

Defendants rely heavily on *Mayo*'s holding that certain medical method claims are ineligible.  (*E.g.*, D.I. 36 at 6-7, 11-12.)  In *Mayo*, however, there was no dispute that those in the field "routinely" "engaged in" both of the claims' active steps in *combination* (administering the drugs and measuring the resulting metabolites) and that the claims did not require the doctor to "actually alter his treatment decision in the light of the test."  132 S. Ct.  at 1296-98.  In contrast, here, there is no evidence here that the recited steps were ever (let alone routinely) previously performed and the challenged claims *do* require an actual impact on the treatment of patients (either excluding or terminating patients from treatment).  It is plain, therefore, that the claims here recite what was lacking in *Mayo*—"a new way of using an existing drug," which *Mayo* itself confirms is patent eligible.  *Id.* at 1302.  Indeed, "'[a]s the first party with knowledge of the [increased aggregate risk], [INO] was in an excellent position to [and did] claim [patent-eligible

applications of that knowledge.'"  *Myriad*, 133 S. Ct. at 2120 (citation omitted).  In short, by reciting an "unconventional step[]," the asserted claims are thereby patent eligible (or at least a fact dispute exists on that score).  *Mayo*, 132 S. Ct. at 1300.

      Similarly, the Federal Circuit recently recognized that where a particular treatment is "ineffective (and even harmful)" to a "particular subset of patients," a treatment regime that excludes that subset "*may reflect a new and useful invention that is patent eligible* despite the existence of prior art or a prior art patent disclosing the treatment method to patients generally." *Prometheus Labs., Inc.*, 805 F.3d at 1098 (emphasis added); *see also Parks v. Booth*, 102 U.S. 96, 102 (1880) ("Modern inventions very often consist merely of a new combination of old elements or devices, where nothing is or can be claimed except the new combination."); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 n.5 (Fed. Cir. 2014) (same).  That is precisely what the claims do here, based on all of the record evidence, even at this early stage.[10]

      The challenged claims here are also like the ones in *Diehr*, 450 U.S. at 185.  In that case, the Supreme Court found eligible claims for an improved process for curing rubber because, although the steps were individually conventional activity in the industry and added only a "well-known" mathematical equation, *id.* at 187, "the *combination* of . . . steps" were not "in context obvious, already in use, or purely conventional."  *Mayo*, 132 S. Ct. at 1299 (emphasis added). As a whole, the claims "solve[d] a technological problem in 'conventional industry practice.'" *Alice*, 134 S. Ct. at 2358 (quoting *Diehr*, 450 U.S. at 178).  So too here.

      In the end, the Defendants' argument devolves into the suggestion that the "excluding" type steps recited in the asserted claims are "not transformative."  (D.I. 36 at 11.)  Defendants'

---

[10]  In contrast, in *Endo*, it was undisputed that the relevant patient group was well-understood: the patent at issue "recognize[d] the use of oxymorphone for pain relief is a well-understood activity."  2015 WL 5580488, at *8.

argument ignores that the salient inquiry is whether the ordered *combination* of steps is sufficient to ensure that the claims do more than patent the natural law itself.  Here, those combined steps plainly do; based on the evidence of record, Defendants have failed to show that the "combination of those steps, were in context obvious, already in use, or purely conventional." *Mayo*, 132 S. Ct. at 1299.  Indeed, the evidence—including the specification itself—shows that the steps were non-obvious, not in use, and unconventional.  (*See* Ex. 1, '966 patent at 9:7-10 ("An analysis of AEs and SAEs from both the ClNRGl and NINOS studies, in addition to post-marketing surveillance, did not suggest that patients who have pre-existing LVD could experience an increased risk of AEs or SAEs."); *id.* at 12:25-26 ("In INOT22, a baseline PCWP value was not included as exclusion criteria"); *id.* at 12:27-34 ("after the surprising and unexpected  identification of SAEs in the early tested patients, it was determined that patients with pre-existing LVD had an increased risk of experiencing an AE or SAE upon administration (e.g., worsening of left ventricular function due to the increased flow of blood through the lungs). Accordingly, the protocol for INOT22 was thereafter amended to exclude patients with a baseline PCWP greater than 20 mm Hg").)

        In sum, and viewing all of the facts in the light most favorable to Plaintiffs, the claims "as an ordered combination" are the opposite of "purely conventional" activity; they instead constitute an inventive application of the (purported) natural law under cases like *Mayo*, *Myriad*, *Prometheus*, and *Diehr*.  At worst, there is a disputed fact issue that cannot be resolved on the pleadings and precludes granting Defendants' motion.

## VI.    CONCLUSION

        For the foregoing reasons, this Court should deny Defendants' motion for judgment on the pleadings because the challenged patent claims satisfy 35 U.S.C. § 101 or, at a minimum, there are disputed fact issues not suitable for resolution at the pleading stage.

20

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek J. Fahnestock*

_____

Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
dfahnestock@mnat.com

OF COUNSEL:

Kenneth G. Schuler
David Callahan
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Melissa A. Brand
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

January 27, 2016

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2016, I caused the foregoing to be electronically filed

with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on

January 27, 2016, upon the following in the manner indicated:

Melanie K. Sharp, Esquire                                          *VIA ELECTRONIC MAIL*
James L. Higgins, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendants*

Michael J. Abernathy, Esquire                                    *VIA ELECTRONIC MAIL*
Sanjay K. Murthy, Esquire
Benjamin E. Weed, Esquire
Margaux L. Nair, Esquire
Maria E. Doukas, Esquire
Christopher E. Hanba, Esquire
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, IL  60602-4207
*Attorneys for Defendants*

Sara N. Kerrane, Esquire                                          *VIA ELECTRONIC MAIL*
K&L GATES LLP
1 Park Plaza
Irvine, CA  92614
*Attorneys for Defendants*

                                        */s/ Derek J. Fahnestock*
                                        Derek J. Fahnestock (#4705)