```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                              -  -  -

 4    MALLINCKRODT HOSPITAL PRODUCTS   )      Civil Action
      IP LTD., INO THERAPEUTICS LLC    )
 5    and IKARIA, INC.,                )
                                       )
 6                 Plaintiffs,         )
                                       )
 7          v.                         )
                                       )
 8    PRAXAIR DISTRIBUTION, INC. and   )
      PRAXAIR, INC.,                   )
 9                                     )
                   Defendants.         )      No. 15-170-GMS
10
                                -  -  -
11
                          Wilmington, Delaware
12                        Wednesday, June 2, 2016
                              9:30 a.m.
13                         Markman Hearing

14                              -  -  -

15    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

16    APPEARANCES:

17            DEREK J. FAHNESTOCK, ESQ.
              Morris Nichols Arsht & Tunnell LLP
18                     -and-
              KENNETH G. SCHULER, ESQ.,
19            DAVID K. CALLAHAN, ESQ.,
              BRENDA L. DANEK, ESQ., and
20            SARAH W. WANG, ESQ.
              Latham & Watkins LLP
21            (Chicago, IL)

22                          Counsel for Plaintiffs

23

24

25
```

1    **APPEARANCES CONTINUED:**

2              **MELANIE K. SHARP, ESQ., and**
             **JAMES L. HIGGINS, ESQ.**
3         **Young Conaway Stargatt & Taylor, LLP**
                        **-and-**
4         **MICHAEL J. ABERNATHY, ESQ., and**
             **SANJAY K. MURTHY, ESQ.**
5         **Morgan, Lewis & Bockius LLP**
             **(Chicago, IL)**

6
                              **Counsel for Defendants**

:02:28
:02:28    7
:02:28                          **- - -**
:02:29    8         **THE COURT:  Good morning.  Please, take your**

:02:30    9    **seats.  Let's begin with introductions, starting with**

:02:32   10    **plaintiff, please.**

:02:34   11         **MR. FAHNESTOCK:  Good morning, Your Honor.**

:02:37   12    **Derek Fahnestock from Morris Nichols on behalf of**

:02:39   13    **plaintiffs.  With me at counsel table is Kenneth Schuler,**

:02:43   14    **Brenda Danek, David Callahan, and Sarah Wang.**

:02:51   15         **With us from the client Mallinckrodt are Kenneth**

:02:55   16    **Goetz and Anthony Cain.**

:02:57   17         **THE COURT:  Good morning.**

:03:02   18         **(Counsel respond "Good morning.")**

:03:04   19         **THE COURT:  Good morning, Ms. Sharp.**

:03:04   20         **MS. SHARP:  Good morning, Your Honor.  On behalf**

:03:08   21    **of the Praxair defendants, Melanie Sharp from Young Conaway**

:03:11   22    **Stargatt & Taylor.  Also from our firm, Jim Higgins.  And**

:03:18   23    **Anupa Smit, our litigating paralegal, is assisting with the**

:03:21   24    **technology.**

:03:22   25         **Your Honor knows my colleague Mike Abernathy.**

:03:24   1               **THE COURT:  I do.**

:03:25   2               **MR. ABERNATHY:  Hi, Your Honor.  Good morning.**

:03:28   3               **MS. SHARP:  And also Sanjay Murthy, now both**

:03:32   4   **from Morgan Lewis.**

:03:33   5               **THE COURT:  Okay.**

:03:37   6               **Counsel, I am going to let you talk a little.**

:03:41   7   **We have one term at issue.  But I want to confess a little**

:03:49   8   **frustration with these parties individually, and the Patent**

:03:56   9   **Bar in general, quite frankly.**

:04:00  10              **It seems to me that your job is to illuminate**

:04:03  11   **issues and not obfuscate them, so that judges like me can**

:04:08  12   **try to make correct decisions.**

:04:10  13              **In this case what I am getting at is both of you**

:04:13  14   **advance the proposition that the plain and ordinary meaning**

:04:18  15   **of the term at issue is what should control, is how I should**

:04:22  16   **define the issue.  On the one hand, plaintiff says, here is**

:04:26  17   **the plain and ordinary meaning, even offered an affidavit by**

:04:30  18   **a doctor, by a POSA, presumably, for that proposition.**

:04:34  19             **On the other hand, the defendant says, it is**

:04:36  20   **plain and ordinary meaning, Judge.  We are not going to tell**

:04:38  21   **you what the plain and ordinary meaning is, but it is plain**

:04:42  22   **and ordinary meaning -- I don't know who is saying it -- and**

:04:44  23   **if you don't do that you run into 02 Micro and you haven't**

:04:48  24   **done your job at the end of the day of giving definition, as**

:04:51  25   **the Markman case tells us I must do.**

| | | |
|---|---|---|
| :04:54 | 1 | What you are doing is you are making my job |
| :04:57 | 2 | unnecessarily difficult, in my judgment, quite frankly, and |
| :05:00 | 3 | I am frustrated by it.  And I have been doing this long |
| :05:04 | 4 | enough to express this frustration in a setting like this, |
| :05:08 | 5 | because I see this time and time and time again. |
| :05:12 | 6 | In the interest of trying to win -- and that's |
| :05:13 | 7 | your job.  We have an adversarial system.  I believe in it, |
| :05:17 | 8 | your job is to win.  You are only as good as your last win, |
| :05:21 | 9 | I get that.  You have a client here from the plaintiff, and |
| :05:25 | 10 | I guess yours is going to hear about the results today.  So |
| :05:27 | 11 | you need to win. |
| :05:28 | 12 | But you also have to pay some fidelity to your |
| :05:32 | 13 | job as lawyers and as officers of the Court.  You have a |
| :05:35 | 14 | responsibility to this Bench, not to me personally, to this |
| :05:39 | 15 | Judge, as an officer of the United States District Court for |
| :05:43 | 16 | the District of Delaware. |
| :05:44 | 17 | I am being a little preachy this morning.  But I |
| :05:47 | 18 | am a little annoyed, quite frankly, after I read the briefs |
| :05:51 | 19 | and the affidavits in this case, and walk away scratching my |
| :05:54 | 20 | head and say, What the heck are we doing here? |
| :05:56 | 21 | That said, I needed to get it off my chest, |
| :06:00 | 22 | let's get on with it. |
| :06:02 | 23 | MR. SCHULER:  Good morning, Your Honor.  If I |
| :06:11 | 24 | can approach. |
| :06:11 | 25 | THE COURT:  Mr. Buckson will take that from you. |

:06:19    1              The one thing I can say is at least it's not a

:06:24    2    jury trial.

:06:36    3              MR. SCHULER:  Your Honor, I certainly understand

:06:38    4    the Court's comments.  I understand.

:06:42    5              A couple of things.  First, we really are trying

:06:45    6    to help the Court.  And we tried through the claim

:06:48    7    construction process to try to negotiate something, frankly

:06:51    8    trying to obviate even the need for this hearing.  I am sure

:06:54    9    the Court can appreciate we were at least able to get down

:06:57   10    to one claim term.  I apologize --

:07:00   11              THE COURT:  I don't mean by my comments to

:07:03   12    suggest that there aren't honest differences and they

:07:06   13    shouldn't be aired out.  That is what the Markman process is

:07:10   14    for.  I get that.

:07:12   15              MR. SCHULER:  I would like to do a little bit of

:07:14   16    background on the nature of the product at issue.

:07:20   17    Mallinckrodt, they are the plaintiffs.  A little bit of

:07:22   18    background for the Court's benefit, and place the

:07:26   19    construction in just a little bit of context.

:07:28   20              During the hearing you will here reference to a

:07:28   21    product called INOmax, for the inhalation or treatment,

:07:31   22    which is a pharmaceutical product that is used to treat

:07:37   23    neonates that have hypoxic respiratory failure, with a

:07:37   24    vasodilator to help dilate the blood vessels to get better

:07:37   25    blood flow.

:07:42   1          What it is indicated for is to treat neonates to

:07:47   2   improve oxygenation and to reduce the need for what is

:07:53   3   called this extracorporeal oxygenation, in other words,

:07:54   4   extracting blood from the body and oxygenating it that way

:07:57   5   and taking out the CO2.

:07:59   6          We have gotten down to one patent and one claim

:08:02   7   term from that patent.  This is the '112 patent that has the

:08:05   8   claim term at issue.

:08:07   9          By way of background, in the prosecution history

:08:09   10   the Court may have noticed that there is a description of

:08:11   11   what happened that led to the invention that's claimed in

:08:16   12   the '112 patent.  It discusses the fact that there was an

:08:19   13   INOT22 study that was performed.  The study design did

:08:24   14   exclude certain candidates, patients, and the prosecution

:08:28   15   history recites the exclusion criteria.  I am at Slide 4.

:08:32   16   But there was no exclusion for patients that have

:08:35   17   preexisting left ventricular dysfunction.  So the Court is

:08:41   18   going hear that by the acronym LVD.

:08:44   19          The prosecution history describes the fact that

:08:47   20   this study was not just in the United States.  It took place

:08:50   21   in several countries.  So both the FDA and some regulatory

:08:54   22   bodies, like the regulatory body for the United Kingdom,

:08:58   23   examined the study protocol to make sure it was adequate.

:09:02   24          In addition, each of the member participating

:09:06   25   medical institutions also had these institutional review

:09:10   1   boards that also had members that reviewed the study.

:09:15   2                    As the specification describes, after the study

:09:20   3   was under way, there was a discovery that there was a

:09:22   4   relatively high number of adverse events, which are called

:09:26   5   AEs in the patent specification, and serious adverse events,

:09:31   6   or SAEs.  They were being reported by the participating

:09:35   7   medical institutions.

:09:37   8                    I don't think there is any question that what

:09:38   9   happened next was the right thing to do, was that the

:09:41   10   reviewers said, what's going on here?  This is an elevated

:09:44   11   level of serious adverse events.  They looked to see whether

:09:48   12   there was a common thread.

:09:49   13                    What they say in the specification is that it

:09:52   14   was determined that patients that were suffering from

:09:55   15   preexisting LVD had an increased risk of experiencing one of

:09:59   16   these serious adverse events.  So they took action by

:10:03   17   amending the protocol for the ongoing study to exclude

:10:07   18   patients that had an elevated level for what's called

:10:10   19   pulmonary capillary wedge pressure, which is a mouthful, so

:10:14   20   they use the acronym PCWP, which the study leaders used as a

:10:20   21   measure of potential left ventricular dysfunction.

:10:26   22                    As the prosecution history reveals, in the first

:10:29   23   part of the study, there was this relatively high rate of

:10:33   24   serious adverse events.  But after the exclusion criteria

:10:37   25   were changed, those were significantly reduced.

:10:41     1                That was the genesis of the inventions that are

:10:43     2   described in the '112 patent.

:10:46     3                 The information that was relayed to the

:10:48     4   participating institutions in terms of the preexisting LVD

:10:52     5   made a drastic difference in patient safety for the balance

:10:57     6   of the study.

:10:57     7                 That is the genesis of the specification at

:10:59     8   issue here.

:11:02     9                 So, Your Honor, we did try and tell you what we

:11:07    10   thought the ordinary meaning was.  The ordinary meaning that

:11:10    11   we have proposed is "nitric oxide gas that is suitably safe

:11:13    12   for pharmaceutical use."

:11:14    13                 The competing position is the plain and ordinary

:11:17    14   meaning as understood by a person --

:11:19    15                 THE COURT:  I am wondering, Mr. Schuler, if you

:11:21    16   remove the worth "suitably," what would that do to your

:11:25    17   definition?

:11:26    18                 MR. SCHULER:  I don't think it would make a

:11:28    19   large difference, Your Honor.  I mean, we have seen in the

:11:32    20   other courts that have construed similarly phrases, like

:11:36    21   pharmaceutically acceptable and acid addition salts, you may

:11:39    22   have experience with claim terms like that, but they use

:11:42    23   words like safe for human pharmaceutical use.  So it may be

:11:46    24   implicit in pharmaceutical use that you don't typically give

:11:49    25   pharmaceuticals that harm a human.

:11:52  1          Chemotherapy may be a bit of a -- we do

:11:57  2    intentionally harm somewhat ourselves to save others.  But I

:12:01  3    think, Your Honor, if Your Honor were to say that, I think

:12:04  4    that that would be fine, because I think the pharmaceutical

:12:06  5    inherently needs to be suitably safe for a given use.

:12:13  6          Again, here we have the '112 patent, which

:12:16  7    issued in September of 2014.  We have Claim 1, where we

:12:21  8    first see the phrase at issue, "pharmaceutically acceptable

:12:24  9    nitric oxide gas."  And it also appears in independent

:12:30  10   Claim 7.

:12:34  11         What I want to do is briefly, Your Honor -- I

:12:36  12   won't take a lot of time -- but I do want to go through

:12:39  13   three subjects.  That is, first, it is a substantive claim

:12:43  14   limitation; secondly, briefly explain why we believe our

:12:46  15   position does reflect the ordinary meaning of the term; and

:12:49  16   finally, explain why we don't think that the proposal by

:12:54  17   defendants clarifies the scope of the claims.

:12:58  18         There is two fundamental reasons why we believe

:13:01  19   that "pharmaceutically acceptable nitric oxide gas" -- and I

:13:04  20   acknowledge it is in the preamble, Your Honor.  I don't

:13:06  21   think there is any dispute about that.  But as we are all

:13:09  22   aware, there are certain instances where the preamble can be

:13:12  23   a limitation nonetheless.  And two of them we believe are at

:13:15  24   issue here.  The first being, there was an amendment during

:13:19  25   the prosecution that evidences we think what is a

:13:21    1    substantive limitation, and also because we believe that

:13:26    2    here the preamble does give meaning to the claim.

:13:31    3             If turn to Slide 14, which is part of the

:13:34    4    prosecution history, in addressing the issue of priority for

:13:39    5    purposes of evaluating the prior art, the examiner looked at

:13:43    6    the preamble and said, I see that you are reciting,

:13:47    7    "providing a pharmaceutical product," I don't see that in

:13:51    8    the priority documents.  I do see in the priority documents

:13:53    9    methods of, quote, "providing pharmaceutically acceptable

:13:57   10    nitric oxide gas."

:14:00   11             So the examiner plainly viewed the preamble as

:14:02   12    having some sort of substantive effect here, because he was

:14:06   13    asking for written description support back to the priority

:14:09   14    documents.

:14:11   15             To address that concern, the applicants amended

:14:15   16    the preamble from "providing a pharmaceutical product,"

:14:19   17    which it was previously, to address the issue, they then

:14:22   18    recited, quote, "a method of providing pharmaceutically

:14:25   19    acceptable nitric oxide gas," which is the limitation as it

:14:29   20    appears today.

:14:33   21             And in the course of discussing the issue with

:14:36   22    the examiner, they had an interview.  And the examiner said,

:14:40   23    look, I agree, if you can get back to the priority

:14:43   24    documents, you effectively antedate the reference that I am

:14:46   25    using for the obviousness rejection, and, in his own words,

:14:49  1    once you do that the obviousness rejection, quote,

:14:52  2    "implodes."

:14:54  3              So the patentee said, that's what we understand

:14:57  4    will happen.  And indeed, it did.  The examiner -- I am

:15:00  5    looking at Slide 17 -- withdrew the rejection based on

:15:06  6    obviousness.

:15:08  7              The Court is well aware of the law.  But we just

:15:11  8    simply note that it parallels here, the prosecution history

:15:15  9    parallels a couple of the cases in a couple of important

:15:17  10   respects.  The first is, as in Catalina Marketing, there was

:15:22  11   a rejection.  The rejection was obviated by amending the

:15:26  12   claims to add the preamble limitation that we see today.

:15:28  13   And in those circumstances we believe that that function

:15:31  14   substantively adds a limitation.

:15:33  15             It is also very similar to Fantasy Sports

:15:37  16   Properties, where the prosecution history demonstrates that

:15:39  17   the examiner treated the preamble as a limitation and, as

:15:42  18   the Court will recall, here the examiner did say, I am

:15:45  19   looking for written description support for this

:15:48  20   pharmaceutical product.  I do see "pharmaceutically

:15:50  21   acceptable nitric oxide gas" in the priority documents.

:15:54  22             So we believe, since the examiner treated it as

:15:56  23   a substantive limitation, that satisfies the case law.

:16:02  24             We do note that Praxair has discussed the fact

:16:05  25   that they think it has to be a prior art rejection.  We

:16:08   1    think the case law really recognizes that there is a lot of

:16:12   2    events that can happen during prosecution, some of them are

:16:14   3    112 issues, some of them are 102/103 issues.  We think the

:16:18   4    case law really addresses the fact that if you substantively

:16:21   5    rely on it by amending, it is a fair point for the public to

:16:25   6    say it is probably a limitation.  And there are some other

:16:28   7    cases that talk about 112 and other rejections.

:16:31   8         So the salient three points, Your Honor, I would

:16:34   9    simply make are the first, the examiner treated the preamble

:16:37  10    as a limitation, the applicants amended the preamble to

:16:42  11    overcome the examiner's rejection, and the claims issued

:16:45  12    following that amendment.

:16:47  13         That is the basis for our claim, that aspect of

:16:51  14    the preamble being limited.

:16:52  15         The second reason is, you know, the old

:16:59  16    Boehringer Ingelheim Vetmedica, the specification doesn't

:16:59  17    give life and meaning to the claims.  It really comes down

:17:02  18    to what the specification says.

:17:04  19         Here we have the specification, at Column 1

:17:06  20    through Column 2, what it says is that one aspect of the

:17:09  21    invention involves providing pharmaceutically acceptable

:17:12  22    nitric oxide gas to a medical provider.

:17:17  23         When the specification describes it in that

:17:19  24    fashion, we think that it does give life and meaning to the

:17:23  25    claims.

:17:25   1          Praxair does have a response to us.  They say

:17:26   2   that is only one aspect of the invention.  I guess our point

:17:29   3   is, this is one of the embodiments, and therefore, it

:17:33   4   presumptively falls within the scope of the claims.  And

:17:35   5   because the patentees chose to describe their invention in

:17:39   6   this particular manner, we believe that, to pay homage to

:17:42   7   the manner in which they described one of their inventions,

:17:46   8   that it does function as a substantive limitation.

:17:52   9          So unless there is any questions, I will turn to

:17:54   10   the ordinary meaning part.

:17:57   11          Your Honor, we put our cards on the table.  Here

:18:00   12   is our proposed construction.  We believe it reflects the

:18:04   13   specification.  It is not lexicography.  I am not saying

:18:07   14   that.  But certainly, they describe the pharmaceutically

:18:13   15   acceptable nitric oxide gas in terms of reducing the risk of

:18:18   16   treatment to patients.  So it does talk about safety.  And

:18:23   17   in that vein, we note simply that a number of other courts

:18:26   18   have construed similar phrases as we discussed before.

:18:29   19   Sometimes it's in the context of salts, sometimes in the

:18:32   20   context of moisturizers and things like that.  But

:18:35   21   generally, they refer to it in terms of safety and

:18:38   22   acceptable for human pharmaceutical use.  And perhaps the

:18:41   23   second one on this is very similar to what the Court

:18:45   24   indicated earlier, that "for human pharmaceutical use" might

:18:50   25   be an appropriate ordinary meaning.

:18:52   1          The point is to say we think that our proposed

:18:55   2   construction does reflect what other courts have seen.  We

:18:58   3   don't think we are out there in left field about what the

:19:00   4   content of this is.

:19:02   5          One argument that Praxair advances is that our

:19:05   6   expert, in an IPR, filed by Praxair, said, you know, what is

:19:11   7   suitably safe could change over time.  We acknowledge that.

:19:14   8   That is exactly why, in our view, the Markman process is

:19:17   9   designed to fix the meaning at one particular point in time,

:19:20   10  which is the effective filing date of the application.

:19:23   11         So as long as the Court can discern what the

:19:25   12  meaning is at that point, that's what the construction

:19:29   13  should be.

:19:29   14         And we note that in their submission to the

:19:32   15  Court, Praxair acknowledges that what we are trying to do is

:19:36   16  fix it at the time of the invention.  So we think that

:19:39   17  addresses their one concern.

:19:42   18         Then lastly, we don't think their proposal

:19:46   19  clarifies the scope.  I will be very brief here, because I

:19:50   20  think it speaks for itself.  But the Clare case from the

:19:54   21  Federal Circuit about a month and a half ago or two months

:19:57   22  ago did say that, yeah, there are words that sometimes

:20:00   23  everybody can understand, but nonetheless, if there is an

:20:03   24  extant dispute between the parties, it is probably

:20:07   25  appropriate to construe those words.

| | | |
|---|---|---|
| :20:08 | 1 | Unless the Court has any questions... |
| :20:11 | 2 | THE COURT:  Thank you, Mr. Schuler. |
| :20:14 | 3 | Counsel. |
| :20:15 | 4 | MR. ABERNATHY:  Thank you, Your Honor. |
| :20:19 | 5 | THE COURT:  I will give you the last word, Mr. |
| :20:21 | 6 | Schuler. |
| :20:21 | 7 | MR. SCHULER:  Thank you. |
| :20:27 | 8 | MR. ABERNATHY:  Your Honor, may I approach? |
| :20:29 | 9 | THE COURT:  Please do.  Mr. Buckson will take |
| :20:34 | 10 | them. |
| :21:04 | 11 | MR. ABERNATHY:  Thank you, Your Honor. |
| :21:05 | 12 | I want to introduce Eric Sarno (phonetic), who. |
| :21:08 | 13 | Is our client representative.  He is the associate general |
| :21:11 | 14 | counsel. |
| :21:11 | 15 | THE COURT:  I am glad both clients got here. |
| :21:15 | 16 | MR. ABERNATHY:  I wanted to make sure that you |
| :21:17 | 17 | understood, the client can see and hear what's going on as |
| :21:20 | 18 | well. |
| :21:20 | 19 | THE COURT:  It is good when the clients come. |
| :21:23 | 20 | MR. ABERNATHY:  Your Honor, I think I am |
| :21:24 | 21 | going to have a very similar organization of the |
| :21:27 | 22 | presentation as Mr. Schuler.  I think we both look at the |
| :21:30 | 23 | issues, at least in an organizational fashion, very much the |
| :21:34 | 24 | same. |
| :21:35 | 25 | The one thing, though, I want to point out |

:21:38     1     initially is, our position is that this claim term is

:21:44     2     non-limiting because it's a preamble term and hence needs no

:21:49     3     construction.

:21:49     4             THE COURT:  I understand that.

:21:50     5             MR. ABERNATHY:  Alternatively, we say, well, if

:21:52     6     it is limiting, it's one that one of skill in the art, a

:21:56     7     physician, a specialized physician, would understand.

:22:00     8             THE COURT:  Let me ask you this, Mr. Abernathy:

:22:02     9     I understand your position, understood it before I came out

:22:05    10     here.  They take a different position.  So let me ask you

:22:14    11     this question first:  Does that set up a situation where

:22:19    12     there are parties who disagree over the definition or the

:22:21    13     scope?

:22:22    14             MR. ABERNATHY:  No, Your Honor.

:22:23    15             THE COURT:  Go ahead.

:22:24    16             MR. ABERNATHY:  May I answer that question?

:22:25    17             THE COURT:  I want you to answer that question.

:22:27    18             MR. ABERNATHY:  So I think under the Finjan

:22:30    19     case, there is no 02 Micro situation here.  The 02 Micro

:22:37    20     issue could be resolved in a couple ways.  Number one, a

:22:40    21     ruling that the claim term --

:22:41    22             THE COURT:  Let's set one further baseline.  The

:22:45    23     Federal Circuit has said, the plain and ordinary meaning can

:22:50    24     suffice.

:22:51    25             MR. ABERNATHY:  Yes, Your Honor.  That was going

| | | |
|---|---|---|
| :22:52 | 1 | to be, I think, my third option. |
| :22:54 | 2 | THE COURT:  All right. |
| :22:56 | 3 | MR. ABERNATHY:  First, the term can be |
| :22:59 | 4 | non-limiting and hence there is no need to construe it. |
| :23:02 | 5 | That's one way around 02 Micro.  The other is to say, there |
| :23:06 | 6 | is a plain and ordinary meaning, one that one of skill in |
| :23:10 | 7 | the art would understand.  And in Finjan, the Federal |
| :23:13 | 8 | Circuit said that does resolve the dispute. |
| :23:16 | 9 | I think, in fact, that would resolve the |
| :23:18 | 10 | dispute. |
| :23:19 | 11 | I don't see a situation here where we have an 02 |
| :23:24 | 12 | Micro dispute.  And certainly a ruling that the claim has |
| :23:29 | 13 | plain and ordinary meaning would satisfy 02 and Finjan.  I |
| :23:36 | 14 | don't need to tell you, Your Honor, I have had a number of |
| :23:38 | 15 | cases, and I have been involved with Your Honor, where you |
| :23:41 | 16 | have often said plain and ordinary meaning for one of skill |
| :23:45 | 17 | in the art. |
| :23:47 | 18 | So that's how we are approaching this issue. |
| :23:51 | 19 | In terms, Your Honor, of the limiting nature or |
| :23:58 | 20 | not of the preamble term, again, Mr. Schuler and I start at |
| :24:02 | 21 | the same place, the claim.  We look at the preamble |
| :24:06 | 22 | language.  We note that the preamble language provides no |
| :24:10 | 23 | antecedent basis.  We talked about that in the brief. |
| :24:14 | 24 | We then rely upon Catalina Marketing, which Your |
| :24:17 | 25 | Honor has cited frequently, where a preamble is not limiting |

:24:22   1   if the patentee in the body of the claim finds a

:24:25   2   structurally complete invention, and I think that's the case

:24:29   3   here.

:24:30   4        If we look at it beyond the preamble, we have

:24:35   5   the body of the claim that talks about providing a cylinder

:24:38   6   with a particular type of gas specified, supplying that

:24:41   7   cylinder to a medical provider, who is responsible for

:24:46   8   treating neonates who have hypoxic respiratory failure, and

:24:51   9   then certain information is provided to the medical

:24:54   10   provider.

:24:55   11        Again, the term at issue does not define any

:25:00   12   other term in the claim.  And as we will see, Your Honor,

:25:05   13   you could eliminate that term.  As Catalina Marketing said,

:25:11   14   it's one thing to look at -- you could eliminate the

:25:14   15   preamble term and the body of the claim remains unchanged.

:25:19   16   One of skill in the art could follow that method without

:25:23   17   that preamble language.

:25:25   18        So the other issue that -- there are a lot of

:25:28   19   tests in Catalina Marketing.  One of the tests that the

:25:32   20   Federal Circuit applies is:  Is the preamble term

:25:36   21   duplicative of language in the claim?  In other words, does

:25:41   22   it bring life to the claim?  Again, we have highlighted the

:25:44   23   language here.  One of skill in the art reading the claim

:25:47   24   would see that, again, it has to be a particular type of

:25:50   25   nitric oxide gas, but most importantly, that cylinder or

:25:56     1      that type of gas is provided to a medical provider for

:26:00     2      treating neonates who have a very, very particular type of

:26:03     3      ailment.  One would understand exactly the type of nitric

:26:09     4      oxide gas one needs to apply.

:26:11     5             As Your Honor has probably seen, in Column 3 of

:26:16     6      the patent, there is a description that this particular gas

:26:21     7      must be FDA approved.  And that approval occurred in this

:26:27     8      situation in 1999.

:26:30     9             So one of skill in the art would read the body

:26:32    10      of the claim and understand precisely that this is a very

:26:37    11      special type of nitric oxide gas for a very, very sick

:26:42    12      child.

:26:43    13             But if there were any doubt, one of skill in the

:26:45    14      art would look in the specification.  And it's laid out.

:26:48    15    This is an FDA product which has been approved since 1999.

:26:57    16             Your Honor, so we are clear on the record --

:27:02    17             THE COURT:  I am at Column 3.  I am trying to

:27:04    18      find the line.

:27:05    19             MR. ABERNATHY:  Yes, Your Honor.  It's Column 3,

:27:09    20      the paragraph under Detailed Description of the Exemplary

:27:13    21      Embodiment, starting at Line 34.

:27:15    22             THE COURT:  Yes.

:27:16    23             MR. ABERNATHY:  It talks about INOmax for

:27:20    24      inhalation was approved for sale in the United States by the

:27:23    25      U.S. Food and Drug Administration, FDA, in 1999.

:27:27   1           As you can see, the specification goes on and

:27:29   2   describes what that gas is composed of and then also what it

:27:35   3   does, what are the beneficial effects of that gas.

:27:39   4           Your Honor, I would submit the claim alone is

:27:42   5   enough to breathe life into that claim.  You don't need the

:27:46   6   preamble.  But if there is any dispute, what is that gas?

:27:49   7   What does it do?  It's FDA approved.

:27:52   8           I think that's the measure.

:28:04   9           So there was some discussion in the briefing

:28:06   10  about the essence of the invention, and that the preamble

:28:10   11  term at issue really reflects the essence of the invention.

:28:14   12  And, Your Honor, I am at Page 12 of the slides.  There is a

:28:18   13  description of the Boehringer case, where the Court talked

:28:22   14  about the essence of the invention.  Yes, that is a test.

:28:26   15  But as we argued in our brief, it's I think a stretch to say

:28:30   16  that the preamble term as exists in the claim today reflects

:28:35   17  the essence of the invention when the invention as

:28:38   18  originally submitted referred to a generic pharmaceutical

:28:43   19  product -- I don't say generic in terms of branded or not --

:28:46   20  but a pharmaceutical product.  That's how the invention was

:28:50   21  originally defined, as Mr. Schuler described in his

:28:54   22  discussion of the file history.

:29:00   23          Mr. Schuler also relied upon this language from

:29:03   24  the specification that said, One aspect of the invention

:29:09   25  includes providing pharmaceutically acceptable nitric oxide

:29:12   1   gas to a medical provider.

:29:15   2              He is absolutely right.  But there are other

:29:18   3   disclosures in the specification that are a little bit

:29:22   4   different.  For instance, the abstract, Page 1, in

:29:25   5   describing the invention, Disclosed are methods of

:29:28   6   distributing a pharmaceutical product -- pharmaceutical

:29:31   7   product -- comprising nitric oxide gas.

:29:38   8              Later in Column 4, there is a description of the

:29:40   9   adverse event.  And in describing the AE, adverse event,

:29:45   10   means "any untoward occurrence in a subject or clinical

:29:48   11   investigation subject administered a pharmaceutical

:29:52   12   product."

:29:55   13              So the patentee used the preamble term that

:29:58   14   exists today and the term "pharmaceutical product"

:30:01   15   interchangeably throughout the specification.

:30:05   16              The preamble term as it exists today certainly

:30:08   17   does not reflect the essence, the core of the invention.

:30:13   18              Moreover, Your Honor, as we saw in Column 3,

:30:16   19   nitric oxide gas had existed and had been approved since

:30:20   20   1999.  It certainly is not the essence of an invention for a

:30:25   21   patent this late in the game.

:30:30   22              Your Honor, we would like now to discuss this

:30:34   23   issue of the amendments during prosecution.

:30:39   24              We agree that that can be an exception, where

:30:43   25   preamble language can have a limiting effect.  But I think

:30:47   1   it's very important to look at what the Federal Circuit said

:30:51   2   in Catalina.  It said, "Clear reliance on the preamble

:30:55   3   during prosecution to distinguish the claimed invention from

:30:58   4   the prior art."

:31:00   5           To distinguish the invention from the prior art.

:31:03   6           Let's see if that happened here.

:31:05   7           Again, we are going to be looking at, I think,

:31:07   8   the same slides, so I will go quickly.  I highlighted the

:31:11   9   language from the office action on Slide 18 that refers to

:31:16   10   priority.  The issue in this prosecution history back and

:31:23   11   forth dealt with an issue of priority, namely, can you,

:31:28   12   patentee, rely upon these older documents to in effect swear

:31:31   13   behind the prior art?  Is there a connection between what

:31:35   14   you claim today and what you claimed in the past for

:31:42   15   priority purposes under Section 119?

:31:45   16           We have the language up there.  Mr. Schuler took

:31:47   17   you through it.  I agree with his chronology.  I simply

:31:49   18   note, though, as the big heading there showed in the office

:31:53   19   action, the issue dealt with priority.  Then again, same

:31:58   20   issue.

:31:59   21           Here is the response by the patentowner on Page

:32:04   22   19.  The issue of priority was raised, and to use the

:32:07   23   language of the patentowner, To address this issue, we are

:32:11   24   going to amend the claim.  We will take out this old

:32:14   25   language, pharmaceutical product, and go back to language

:32:17   1   that was in the earlier priority documents, "providing

:32:21   2   pharmaceutically acceptable nitric oxide gas."  Again,

:32:25   3   dealing with priority.

:32:30   4          Another important point, Your Honor, because if

:32:32   5   you read Catalina Marketing and some other cases, the

:32:35   6   question is, what did the examiner say and was there

:32:39   7   acquiescence in that statement?

:32:42   8          Here, the applicants said, in effect, we still

:32:46   9   think we were right in our original application.  We think

:32:51   10  we had enough there to show priority.  In effect, we didn't

:32:54   11  need to amend, but to secure rapid advancement, we are going

:33:00   12  amend.  But there certainly is no acquiescence in the view

:33:03   13  of the examiner.  They wanted their claims issued.  So they

:33:07   14  amended.  They got the priority.

:33:10   15         Then, Your Honor, this question, did you change

:33:16   16  the invention, did you limit the invention in the preamble

:33:19   17  in order to get around the prior art?  Absolutely not.  They

:33:22   18  didn't need to do that because, again, they were able to

:33:26   19  swear behind.  And because they are able to swear behind the

:33:31   20  reference, the VasoKINOX reference, that no longer was prior

:33:35   21  art.

:33:36   22         So once they swore behind, they didn't need to

:33:39   23  deal with the prior art.  They got behind it.

:33:41   24         So they didn't need to change their invention.

:33:43   25  Their preamble language was not narrowing.  It was not

:33:46    1    changing.  It simply allowed them in effect to go back into

:33:50    2    time.

:33:51    3           I would submit, Your Honor, under those

:33:52    4    circumstances, this narrow exception under Catalina

:33:56    5    Marketing does not apply.

:34:10    6           Your Honor, I think I made the point there.

:34:14    7           We have addressed Fantasy Sports.  It's in our

:34:18    8    brief.  I am not going to use our time for that, Your Honor.

:34:21    9           I want to address this issue of "suitably safe."

:34:24   10    Your Honor raised the question, well, what if we remove

:34:27   11    "suitably" and just have "safe"?

:34:30   12           Many drugs, Your Honor, can be safe but they are

:34:34   13    not effective.  The FDA applies a standard called "safe and

:34:39   14    effective."  And I think if you simply limited the

:34:44   15    definition to safe, you would apply a term that's not used

:34:49   16    in the art and you would apply a phrase that one of skill in

:34:54   17    the art certainly would not be familiar with.

:34:58   18           The FDA uses standard "safe and effective."  But

:35:02   19    the construction on the table is "suitably safe."  And, you

:35:07   20    know, again, as we briefed it, that language -- I am sorry,

:35:11   21    Your Honor.

:35:11   22           THE COURT:  Point taken.  What if the definition

:35:13   23    were nitric oxide that is suitable for pharmaceutical use?

:35:19   24           MR. ABERNATHY:  Suitable...

:35:20   25           My point on that, Your Honor, is, suitable for

:35:23    1    whom?  For what?  Under what circumstances?

:35:28    2               I looked up last night on an online dictionary

:35:33    3    what suitably means.  Basically, suitably means sort of

:35:39    4    what's good under the circumstances.

:35:41    5               We have a term that I believe one of skill in

:35:44    6    the art would understand as defined in the claim.  So then

:35:47    7    the suggestion is, well, let's put in a term of

:35:51    8    subjectivity, "suitably safe."  And then I would ask Your

:35:55    9    Honor, for what purpose?  Why is that term there?  One of

:36:00   10    skill in the art would not need it.  It doesn't look like

:36:04   11    the claim needs it.  It's not found in the specification,

:36:07   12    that definition certainly isn't.

:36:09   13               Mr. Schuler correctly pointed out, there is lots

:36:13   14    of language in the specification regarding the INOT study.

:36:16   15    And, sure, they tried to conduct that test safely.  They

:36:21   16    tried to have a drug product, obviously, that was going to

:36:26   17    be safe.  Certainly not the essence of the invention,

:36:29   18    certainly not reflecting at all what the patentee may or may

:36:34   19    not have thought about that term.  And it certainly doesn't

:36:37   20    reflect, from what we can tell, what one of skill in the art

:36:42   21    would understand that term to mean.

:36:43   22               So, Your Honor, Dr. Rosenthal provided a

:36:48   23    declaration.  We looked at that declaration.  And I put up

:36:52   24    on the screen on Slide 26, here is his opinion on suitably

:36:57   25    safe.  I circled to show that it's interesting, there is no

:37:03   1    citation for that proposition.

:37:07   2          He does refer to the INOT study.  But again, the

:37:12   3    INOT study nowhere discloses the phrase pharmaceutically

:37:17   4    acceptable nitric oxide gas.  I did an electronic search of

:37:21   5    it last night.  Couldn't find it.  It never mentions the

:37:25   6    term suitably safe.  And it refers to the drug at issue as

:37:31   7    INOmax, nitric oxide, and pharmaceutical product, with the

:37:36   8    exception of INOmax, again, excuse the pun, I don't mean it

:37:39   9    this way, but the generic use of a particular gas.  And

:37:44  10    interestingly, those of skill in the art, who read that

:37:47  11    study, relied on that study, understood precisely what

:37:50  12    nitric oxide meant and what pharmaceutical product meant,

:37:54  13    and did not need any particular description of suitably

:37:59  14    safe.

:38:00  15          Your Honor, unless you want to go through the

:38:03  16    back-up slides, that's my presentation.

:38:05  17          THE COURT:  No.  I want to get you and Mr.

:38:07  18    Schuler to bear with me for a moment.  And perhaps it's an

:38:12  19    academic discussion, perhaps not.  Perhaps it will help me

:38:17  20    resolve the differences in the two positions, understanding

:38:19  21    your preliminary remarks that in your view, this is not an

:38:26  22    02 Micro situation.

:38:31  23          Imagine two POSAs on the stand disagreeing or

:38:37  24    having different views on the plain and ordinary meaning of

:38:43  25    the scope of this particular term.  What would the jury

:38:45   1    **instruction look like were this a jury trial?  What would I**

:38:50   2    **tell the jury?  How would the glossary look?  Number one, do**

:38:59   3    **I posit an unrealistic hypothetical?**

:39:02   4          **MR. ABERNATHY:  Your Honor, I think that's a**

:39:04   5    **really good question.**

:39:08   6          **I have seen your opinions.  In the**

:39:10   7    **pharmaceutical context I have seen your opinions, where you**

:39:16   8    **have indicated that for preamble terms it's not limiting but**

:39:20   9    **in any event one of ordinary skill in the art would**

:39:24  10    **understand what that term means.**

:39:27  11          **And if this were a jury trial, and if you look**

:39:30  12    **at the claims, it's probably the same with a Bench trial,**

:39:38  13    **Your Honor, in some ways, but if you go back and look at the**

:39:42  14    **claim itself, my bet is -- Slide 11 -- my bet is, strong**

:40:00  15    **bet, the fight in this case is not going to be about what**

:40:03  16    **does pharmaceutically acceptable nitric oxide gas mean.  Not**

:40:08  17    **at all.**

:40:09  18          **If you look at the claim, and this is what was**

:40:12  19    **argued up in the IPR, I am going to use some loose language**

:40:18  20    **just to make the point -- I understand that Judge Rader**

:40:20  21    **would not like what I am about ready to say -- but the heart**

:40:23  22    **of the claim, the heart of the claim really comes down to**

:40:27  23    **what is provided to the medical provider.  Interestingly,**

:40:31  24    **none of that has anything to do with pharmaceutically**

:40:36  25    **acceptable nitric oxide gas.  It all depends, in effect, on**

:40:42   1   what are the labeling requirements, what's provided, what's

:40:46   2   excluded.

:40:49   3          That, I think, is where the dispute would be.

:40:52   4   If this were a jury trial, no one would spend any time on

:40:56   5   that preamble phrase.  It's not where in effect the money is

:41:00   6   on infringement.  It wouldn't happen.

:41:02   7          So, Your Honor, I also come back to the

:41:07   8   specification.  If we had experts on the stand, and, Your

:41:14   9   Honor, you asked them, what do you understand this to mean,

:41:18   10  in light of the specification, they certainly would have to

:41:20   11  concede that this gas, as described in the specification,

:41:26   12  must be FDA approved.

:41:30   13         So Mr. Schuler is right.  We did not proffer a

:41:32   14  construction.  So I don't think it's right or fair for me to

:41:37   15  on the spot come up with one.  I just don't think that at

:41:40   16  the end of the day the heart of the dispute is going to be

:41:43   17  that preamble term.

:41:44   18         THE COURT:  Before you sit down, I think your

:41:46   19  colleague wants to say something to you.

:41:51   20         MR. MURTHY:  Thank you, Your Honor.

:42:01   21         MR. ABERNATHY:  So, Your Honor, my handler just

:42:06   22  indicated to me -- I don't think Mr. Schuler or anyone else

:42:11   23  would claim that pharmaceutically acceptable nitric oxide

:42:15   24  gas is the invention.  I don't think they are going to claim

:42:19   25  that the '112 patent invented this type of gas.  The

:42:25  1    VasoKINOX reference that was the subject of the file history

:42:27  2    back and forth, that, too, used nitric oxide gas for medical

:42:33  3    purposes.

:42:34  4             THE COURT:  Thank you, Mr. Abernathy.  Thank

:42:35  5    you, counsel.

:42:42  6             Mr. Schuler, you can start out whatever you

:42:45  7    want.

:42:45  8             MR. SCHULER:  I will start with your question,

:42:47  9    Your Honor.

:42:49  10             I was taught by a very wise judge to try and

:42:54  11    avoid reversal.  What I would think about, if I was either

:42:57  12    the lawyer or yourself, I would try and avoid reversal.  If

:43:01  13    I can go to my slide --

:43:02  14             THE COURT:  So you understand, that's my Satchel

:43:04  15    Paige.  I don't look over my shoulder.  Somebody is going to

:43:08  16    be gaining on me.  I don't care about reversal, quite

:43:12  17    frankly.

:43:13  18             MR. SCHULER:  At any rate, I would like to see

:43:15  19    what other people had done.  It seems to me that, by Slide

:43:20  20    27, given that others have construed it to have what the

:43:22  21    Court actually indicated, suitably -- either safe or

:43:26  22    suitable for pharmaceutical use, I think that is a pretty

:43:29  23    safe place to be, to say that is at least an ordinary

:43:32  24    meaning.  That is not again not in left field, to use the

:43:36  25    baseball analogy, that it is in the infield.  When we are

:43:39  1  trying to do the best we can, that is a pretty good place to

:43:42  2  start.

:43:42  3          Let me then go to where Mr. Abernathy was before

:43:45  4  that, which was, you know, critiquing what we have offered

:43:48  5  and what the Court has offered as potential constructions.

:43:51  6          So when I hear him disagree with those, for

:43:54  7  various reasons, and I am not going to critique the reasons,

:43:57  8  it tells me we do have a situation where apparently there is

:44:00  9  a substantive dispute about what the ordinary meaning is.

:44:02  10  On the one hand, we have put our card on the table, so you

:44:07  11  know what we think it means.  I am not exactly sure what the

:44:10  12  contours of what Praxair believes it means.  But it does

:44:14  13  seem to me that we are in one of those situations where

:44:17  14  there is enough of a dispute, but apparently it does make

:44:20  15  some difference.

:44:21  16          THE COURT:  Why doesn't Mr. Abernathy's citation

:44:23  17  to Column 3 in the intrinsic record, which notes gas has to

:44:27  18  be FDA approved, what underlies that phrase, always, is safe

:44:33  19  and effective.  Right?  I think us lay folks can agree on

:44:37  20  that.

:44:37  21          MR. SCHULER:  Yes.  I think that is what we have

:44:40  22  in our construction.

:44:40  23          THE COURT:  So a POSA would know that.

:44:43  24          MR. SCHULER:  The interesting point, Your Honor,

:44:45  25  that is talking historically.  It says here is the

:44:48    1    beginning, we have the drug.  It has been approved since

:44:50    2    '99.  We undertake the study.  So the drug was approved.

:44:53    3    Yet it was not suitably safe.  That's why they amended the

:44:57    4    protocol.  In other words, we have an FDA-approved drug --

:45:00    5              THE COURT:  I am going to ask you to respond to

:45:02    6    that, Mr. Abernathy.

:45:03    7              And I will give you the last word.  You will

:45:05    8    always have the last word on this.  Mr. Schuler.

:45:07    9              MR. SCHULER:  So we have a situation where we

:45:09    10   have an FDA-approved drug that is not suitably safe in the

:45:14    11   population based on the early returns of the INOT22 study.

:45:17    12   So we have an amendment to the protocol to make it suitably

:45:20    13   safe.

:45:20    14             If I can go to the claim, which should be about

:45:24    15   Slide 7.

:45:36    16             So it is making a pharmaceutically acceptable

:45:41    17   nitric oxide gas.  Our view is that the information about

:45:45    18   those patients that might be at risk from the FDA-approved

:45:50    19   drug is how you make the method of distributing it

:45:54    20   pharmaceutically acceptable.  In other words, the

:45:56    21   information helps make the drug suitably safe for

:45:59    22   administration.  I think that's the distinction.  Again, you

:46:02    23   have an FDA-approved drug.  It proved to be unsafe, so to

:46:07    24   speak, as we saw from the specification that they were

:46:10    25   trying to make it safer with the protocol change.  You had a

:46:14      1      decrease in serious adverse events after you made the

:46:17      2      protocol change.

:46:18      3                  And so one aspect of the invention, again, going

:46:22      4      to the specification at Column 1, bordering on Column 2, was

:46:32      5      one aspect out of our invention is providing

:46:35      6      pharmaceutically acceptable nitric oxide gas and informing

:46:39      7      them about this so you can reduce the risk of those serious

:46:43      8      adverse events.  That is why I think the ordinary meaning

:46:45      9      here has some difference.

:46:46      10                 One last comment on Fantasy Sports.  I do

:46:50      11     think -- that's the Federal Circuit -- they do take it to

:46:52      12     112 as opposed to 103, and they say that is an acceptable

:46:55      13     reason.  More importantly, we have evidence as to how a

:46:59      14     person of ordinary skill here, I think, reacts when they see

:47:01      15     the claim.  That is the examiner.  He said, look, I see your

:47:05      16     preamble.  I don't see support for it.  I see support in the

:47:08      17     priority document, but I don't see support for this

:47:11      18     pharmaceutical phrase.  So we amended.

:47:14      19                 So I think that is a common-sense -- I think

:47:17      20     Fantasy Sports has a common-sense approach, which is, hey,

:47:20      21     if the customer treats it like it's a subsequent limitation,

:47:25      22     then we ought to alter it like it's a substantive

:47:29      23     limitation.

:47:30      24                 THE COURT:  Mr. Abernathy, do you want to take a

:47:34      25     shot at it?

:47:34    1                 **MR. ABERNATHY:  Sure.**

:47:56    2              **I will answer Your Honor's question.**

:47:59    3              **So this term, "providing pharmaceutically**

:48:03    4   **acceptable nitric oxide gas," as you saw from the file**

:48:07    5   **history, that term was in the earlier priority documents.**

:48:11    6   **That term was old in the art.  Nothing new there.**

:48:18    7              **Mr. Schuler's argument is, well, wait a minute,**

:48:20    8   **we had this INOT22 study, and we found out a way, in effect,**

:48:26    9   **I think I heard him say, to make this drug even safer.**

:48:29   10              **So the invention, assuming there is an**

:48:32   11   **invention -- again, we disagree with that, but for purposes**

:48:35   12   **of our discussion -- the invention from that INOT study was**

:48:40   13   **claimed in the providing to the medical provider the**

:48:45   14   **following information.**

:48:47   15              **So the INOT study that Mr. Schuler talked about,**

:48:53   16   **there were some findings.  I understand that you should**

:48:59   17   **exclude certain patients because of the findings of that**

:49:03   18   **study.  That criteria, arguably -- arguably -- is set forth**

:49:11   19   **in the section providing to the medical provider**

:49:15   20   **information, and I think Romanesque (ii)(b) is the**

:49:22   21   **information that at least allegedly reflects what Ikaria**

:49:33   22   **would say would be the results of that test.**

:49:35   23              **So pharmaceutically acceptable nitric oxide gas.**

:49:40   24   **That gas was safe and effective, FDA approved in 1999.**

:49:46   25   **Nothing changed in the nature of the gas.  The claim doesn't**

:49:49   1   change the nature of that FDA-approved gas.  What changed in

:49:54   2   the claim is the type of information that's provided to a

:49:58   3   medical provider to make a decision to elect to avoid

:50:04   4   treating one or more of a plurality of patients.

:50:07   5           Now, just so that the record is clear, this is

:50:11   6   exactly what we are arguing about in the PTAB, whether that

:50:15   7   is just printed matter or not.

:50:17   8           I don't want anyone to say that my description

:50:19   9   of their argument somehow is a concession.  But to answer

:50:23   10  your question, Your Honor, assuming there is an invention,

:50:26   11  where is it in the claim?  We don't think it's there.  But

:50:29   12  to give them their due, their side, it would be (ii)(b),

:50:36   13  certainly not a pharmaceutically acceptable nitric oxide

:50:40   14  gas.

:50:41   15          Again, I refer to Column 3 for support.

:50:43   16          THE COURT:  Thank you, Mr. Abernathy.

:50:45   17          Mr. Schuler, anything else on that?

:50:46   18          MR. SCHULER:  No.

:50:48   19          THE COURT:  Counsel, my preliminary remarks

:50:52   20  notwithstanding, this is why I continue to have live Markman

:50:57   21  hearings, because when we have good lawyers, these hearings

:51:01   22  do provide illumination.  So I appreciate it.  Thank you.

:51:06   23          (Counsel respond "Thank you.")

:51:06   24          (Hearing concluded at 10:18 a.m.)

:51:06   25  Reporter:  Kevin Maurer